Date signed March 30, 2012



WENDELIN I. LIPP
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| William Everett Poffenberger, | * | Case No. 09-35124-WIL |
| | * | Chapter 7 |
| Debtor. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| Lafarge North America, Inc., | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Adversary No.  10-00527 |
| | * | |
| William Everett Poffenberger, | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### <u>MEMORANDUM OPINION</u>

Before the Court is the "Amended Complaint by Lafarge North America, Inc. to Determine

Dischargeability of Debt (11 U.S.C. § 523(a)) and to Object to Debtor's Discharge (11 U.S.C. §

727(a))" (the "Amended Complaint") and the "Debtor's Supplemental Answer and Affirmative

Defenses to All Counts of Plaintiff's Complaint" (the "Answer").  The Court held a two-day trial

on May 10-11, 2011, at the conclusion of which the parties were permitted to file post-trial briefs. The Court has considered the pleadings filed by the parties, the oral arguments made by counsel, the testimony given at trial, and the exhibits admitted into evidence. For the following reasons, the Court finds in favor of the Plaintiff on Count II of the Amended Complaint and the Debtor shall be denied a discharge pursuant to 11 U.S.C. § 727(a)(7).

## I.   **Findings of Fact**

The following facts were either stipulated to by the parties or established at trial, and are relevant to the Court's determination.[1]  Plaintiff, Lafarge North America, Inc., ("Plaintiff" or "Lafarge") is a Maryland Corporation that maintains its principal places of business in Herndon, Virginia, and Southfield, Michigan.  Defendant, William Everett Poffenberger ("Debtor", "Defendant" or "Poffenberger") is a resident of Maryland.  Poffenberger was the stockholder (with his wife, as tenants by the entirety), officer and director of Everett V. Moser, Inc. ("Moser"), a ready-mix concrete producer.[2]  Moser can be described as a family business.  Moser was started by the Debtor's grandfather and was eventually inherited by the Debtor and his siblings.[3]  The Debtor's son, Dwayne Poffenberger, worked for Moser performing maintenance and dispatch duties and driving a truck from the time he was a teenager until it ceased operating.  The Debtor's daughter, Billi Jo Horseman, worked for Moser from 1996 until it ceased operating.  While working for Moser, Ms. Horseman handled Moser's accounts receivable, accounts payable,

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

[2] Moser filed a Chapter 7 Voluntary Petition on March 30, 2010, Case No. 10-16844-PM. Moser's bankruptcy case was closed on December 22, 2010.

[3] The Debtor testified that he bought his brothers and sisters out over a several-year period after they inherited the business.  By approximately 1996, the Debtor and his wife were the 100% owners of Moser.

2

payroll, and answered Moser's telephones.

In September, 2000, Moser sought and obtained credit from Lafarge so that it could make open-account purchases of cement from Lafarge. On or about September 8, 2000, Poffenberger and Moser signed and submitted to Lafarge a written Credit Application and Agreement (the "Application"). Pursuant to the Application, Poffenberger personally guaranteed payment of the amounts due to Lafarge by Moser. After establishing credit with Lafarge, and for years thereafter, Moser purchased cement from Lafarge and, in due course, made payment therefore. Neither Moser nor the Debtor made any payment to Lafarge for any cement purchased by Moser from and after early June, 2008.

In July, 2009, Lafarge filed suit in the Circuit Court for Frederick County, Maryland against Moser and the Debtor (the "State Court Action"). In the State Court Action, the Debtor and Moser denied the allegations of Lafarge's complaint concerning the amounts due Lafarge and their obligations to pay those amounts. In the State Court Action, Lafarge served document discovery requests to Poffenberger and Moser by mail on September 16, 2009. At some point in October, 2009, Poffenberger concluded that Moser could no longer continue in business and he informed his children that he was going to close Moser and file for bankruptcy protection. Also in October, 2009, Poffenberger retained his bankruptcy counsel, Craig Palik, Esq. On October 19, 2009, Poffenberger and Moser served written responses to the document discovery requests served by Lafarge on September 16, 2009. On October 30, 2009, Moser first produced documents to Lafarge. Moser's accounts payable ledger pertaining to Lafarge, a copy of which had been requested by Lafarge on September 16, 2009, was not produced to Lafarge until November 16, 2009. The Debtor testified that between the end of October, 2009, and the beginning of November, 2009, the Comptroller of Maryland placed a lien on Moser's business bank accounts.

3

The Debtor further testified that approximately two weeks later, the Comptroller of Maryland placed a lien on the Debtor's personal bank account.

On or around November 4, 2009, the Debtor, in contemplation of a sale of Moser's concrete mixing vehicles, obtained an appraisal of those vehicles. On November 18, 2009, the documents for the formation of Bolivar Ready Mix, LLC ("Bolivar") were signed. Like, Moser, Bolivar is a ready-mix concrete business. Bolivar is owned by the Debtor's children, Dwayne Poffenberger and Billi Jo Horseman. On November 23, 2009, Bolivar filed its Articles of Organization. On November 25, 2009, Lafarge filed a motion for summary judgment in the State Court Action. On December 6, 2009, Moser ceased operations. On December 7, 2009, Bolivar deposited a check in the amount of $2,000.00 into its operating account. The check was from Compass, a former customer of Moser's, and was a prepayment for materials purchased by Compass from Bolivar. On December 8, 2009, Moser purchased materials from Lafarge despite having ceased operations two days earlier. Also on December 8, 2009, Bolivar commenced operations out of the same plant from which Moser had operated, Bolivar made its first delivery to Compass, the same customer who had pre-paid Bolivar, and Bolivar hired the Debtor as a driver. On December 10, 2009, a bill of sale was executed reflecting the sale of all of Moser's concrete mixing vehicles to Bolivar. Without its vehicles, Moser no longer had the ability to produce or deliver concrete. Moser Farms, Inc. (owned by Poffenberger and his wife as tenants by the entirety) provided the financing to Bolivar that enabled Bolivar to acquire the Moser vehicles. The Debtor testified that Moser Farms, Inc. acquired the funds it loaned to Bolivar from the Debtor and his wife, who had borrowed the money from John and Nancy Hendricks (the "Hendricks Loan"). The Hendricks Loan was neither listed on the Debtor's original bankruptcy schedules, nor on the Debtor's amended bankruptcy schedules, as either an obligation of the Debtor's or as a debt owed

4

to the Debtor by Moser Farms, Inc.  On December 10, 2009, Moser and Poffenberger's counsel in the State Court Action (Leslie Powell, Esq.) moved to withdraw from her representation.  On December 23, 2009, Poffenberger filed his Chapter 7 Voluntary Petition (the "Petition Date").

Prior to cessation of its business operations, Moser had operated on (and was obligated to pay rent for its use of) real property owned by an entity known as Moser, LLC, and utilized (and was obligated to pay rent for its use of) a concrete batching plant also owned by Moser, LLC. Moser, LLC was and still is owned by Poffenberger and his wife as tenants by the entirety. Beginning in December, 2009, and continuing since then, Bolivar has operated its ready-mix concrete business at the same location from which Moser had operated.  Bolivar has also been utilizing the same trucks (which were purchased by Bolivar) and concrete batching plant (leased now by Bolivar) as was used by Moser in the operation of its business.  Bolivar pays or is obligated to pay Moser, LLC for the use of the real property and concrete plant used by Bolivar. Other than the concrete-mixing vehicles, Bolivar did not purchase any of Moser's assets— tangible or intangible.  On February 25, 2010, Lafarge informally requested documents regarding any transactions between Bolivar and either or both Moser or the Debtor.  Prior to Moser's bankruptcy filing on March 30, 2010, no public notice was given or public filing made disclosing the sale and transfer of Moser's concrete mixing vehicles to Bolivar.  Prior to March 30, 2010, Moser did not advise Lafarge of the sale and transfer of its concrete mixing vehicles to Bolivar.

During the first nine months of Bolivar's operations, Bolivar billed approximately $690,000.00 to Moser's former customers.  After its formation, Bolivar continued to make payments to North Star Foundations, a foundation company, for a loan North Star Foundations made to Moser that was guaranteed by the Debtor, Dwayne Poffenberger and Billi Jo Horseman. Although Bolivar is not indebted to North Star Foundations, it continued to pay this obligation.

5

The Debtor testified that he had not made any payments to North Star Foundations since he filed his bankruptcy petition and that he believed that the loan was being paid by Bolivar. Dwayne Poffenberger and Billi Jo Horseman both testified that they had guaranteed the loan from North Star Foundations to Moser and that Bolivar was making payments to North Star Foundations on account of its loan to Moser.

Lafarge's summary judgment motion against Moser (filed in the State Court Action) was granted, without any opposition, on March 3, 2010, and judgment was entered in favor of Lafarge and against Moser in the amount of $357,172.29 (the "Judgment"). In aid of enforcement of the Judgment, on March 15, 2010, a subpoena seeking information was issued by the Circuit Court for Frederick County, Maryland to Bolivar. The Parties stipulated that the subpoena was duly served on Bolivar. Similar discovery was sought from Moser. In March, 2010, Lafarge sought court-ordered discovery from Moser in the State Court Action on an expedited basis. In response to Lafarge's motion, on March 18, 2010, Douglas K. Thornton, Esquire appeared for Moser in the State Court Action and requested additional time to respond to Lafarge's discovery requests. Mr. Thornton's March 18, 2010 appearance for Moser was made at Moser's request and direction, communicated by Poffenberger. On March 18, 2010, the Court in the State Court Action entered an Order (the "Discovery Order") compelling Moser to produce, on or before March 30, 2010, all of the documents Lafarge had sought in its motion. Moser did not respond to the Discovery Order on or prior to March 30, 2010. On March 30, 2010, Moser filed a petition under Chapter 7 of the Bankruptcy Code ("Moser Bankruptcy"), as authorized by Moser's shareholders. At all times during the period January, 2008 through March 30, 2010, Poffenberger was the President of Moser. At all times during the period January, 2008 through March 30, 2010, Poffenberger and his wife were, as tenants by the entirety, the sole shareholders of Moser.

6

On April 22, 2010, Lafarge filed motions in the Moser Bankruptcy and in the Debtor's bankruptcy case seeking separate orders for Rule 2004 examinations of Moser and Poffenberger, respectively. Lafarge's motions for Rule 2004 examinations were granted by Orders dated April 26, 2010 and May 7, 2010, respectively (the "Rule 2004 Orders"). Poffenberger and Moser timely provided some, but not all of the documentary discovery required by the Rule 2004 Orders. Documents were first produced by Moser and Poffenberger via e-mail at 7:00 p.m. on May 20, 2010. Both Moser and Poffenberger advised on May 21, 2010, that additional documentary discovery required by the Rule 2004 Orders would be provided. Poffenberger's deposition was rescheduled in order to permit production of materials required by the Rule 2004 Orders, and extensions of time to object to Poffenberger's discharge were correspondingly required. Motions for those extensions were made and orders obtained upon consent of the parties. The documents reflecting the use of the proceeds arising from the sale of Moser's vehicles to Bolivar (the "Moser-Bolivar Transaction") were not disclosed to Lafarge until June 4, 2010.

During the June 17, 2010 examination of Poffenberger (individually and on behalf of Moser), Lafarge's counsel requested that Moser and Poffenberger provide evidence to support the claims set forth in the verified schedules filed in the Moser Bankruptcy, that Moser was indebted to Dwayne Poffenberger and Billie Joe Horseman. Also during the June 17, 2010 examination of Poffenberger, Lafarge requested documents to support the financing of the Moser-Bolivar Transaction, which documents Lafarge ultimately received. On or about June 17, 2010, Moser agreed to provide whatever documents it had to support the claims of Poffenberger's children against Moser. Moser did not produce any documents to support the claims of Poffenberger's

children against Moser.[4]

## II.    Analysis

Count I of the Amended Complaint seeks a determination that the debt owed by the Debtor to Lafarge is nondischargeble under 11 U.S.C. § 523(a)(6).  Count II of the Amended Complaint seeks a denial of the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2), (4), and (7).  Because the Court finds that Plaintiff prevails on Count II of the Amended Complaint, it will begin its analysis there.

### A.    11 U.S.C. §§ 727(a)(2) and (7)

Count II of the Amended Complaint seeks a denial of the Debtor's discharge under 11 U.S.C. § 727(a).  "Section 727 of the Bankruptcy Code allows debtors to receive a general discharge of their debt in keeping with the Code's purpose of giving honest debtors a fresh start 'unhampered by the pressure and discouragement of preexisting debt.'" *Wachovia Bank, N.A. v. Voccia (In re Voccia)*, Adv. No. 09-03242-DOT, 2011 WL 351187, at *5 (Bankr. E.D. Va. Feb. 1, 2011)(*citing Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir.1994)).  "However, provisions enumerated in § 727(a)(1)-(10) prohibit a discharge for those who 'play fast and loose with their assets or with the reality of their affairs.'"  *Id.* (*citing Farouki,* 14 F.3d at 249).  Due to the extreme penalty imposed by Section 727, *i.e.,* the denial of discharge, objections to discharge are construed strictly against the objecting party and liberally in favor of the debtor.  *See State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996).  The party objecting to a debtor's discharge bears the burden of proving its objection by a preponderance of

---

[4] At trial, the Defendant attempted to introduce documentation supporting the loans allegedly made to Moser by the Defendant's children into evidence; however, the Defendant was precluded from doing so based on a pre-trial ruling.

the evidence.  *See Farouki*, 14 F.3d at 249.  "Although the burden may shift to the debtor to

provide satisfactory, explanatory evidence once the creditor has established a *prima facie* case, the

ultimate burden rests with the creditor."  *Id.*  "A party objecting to discharge need prove only one

of the grounds for non-dischargeability under § 727(a) because the provisions of § 727(a) are

phrased in the disjunctive."  *Id.* at 250.

In this case, Count II of the Amended Complaint seeks a denial of the Debtor's discharge

pursuant to Sections 727(a)(2)(A), (a)(4), and (a)(7).  Section 727(a)(2)(A) provides, in relevant

part:

> (a) The court shall grant the debtor a discharge, unless--
>
>   (2) the debtor, with intent to hinder, delay, or defraud a creditor or an
> officer of the estate charged with custody of property under this title, has
> transferred, removed, destroyed, mutilated, or concealed, or has permitted
> to be transferred, removed, destroyed, mutilated, or concealed--
>
>> (A) property of the debtor, within one year before the date of the filing
>> of the petition; or
>>
>> (B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2).[5]

Section 727(a)(2) "serves to deny a discharge when the debtor 'attempts to prevent the

collection of his debts by concealing or disposing of assets.'"  *In re Voccia*, 2011 WL 351187, at

*5 (*quoting Butler v. Ingle (In re Ingle)*, 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987)).  To bar a

---

[5] Related to Section 727(a)(2) is Section 727(a)(7), which provides:

> (a) The court shall grant the debtor a discharge, unless--
>   (7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or
> (6) of this subsection, on or within one year before the date of the filing of the
> petition, or during the case, in connection with another case, under this title or
> under the Bankruptcy Act, concerning an insider[.]

11 U.S.C. § 727(a)(7).  Here, Section 727(a)(7) renders Section 727(a)(2)(A) applicable to the Debtor's
actions in connection with the Moser Bankruptcy.

debtor's discharge under Section 727(a)(2)(A), the plaintiff must prove each of the following elements by a preponderance of the evidence: (1) the debtor transferred, removed, destroyed, mutilated or concealed, (2) his or her property, (3) within one year of the bankruptcy petition's filing, (4) with the actual intent to hinder, delay, or defraud a creditor. *See Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 780 (Bankr. D. Del. 2002). "Because direct evidence of a debtor's intent usually will be unavailable, it may be inferred from the circumstances surrounding his objectionable conduct." *Matter of Krehl,* 86 F.3d 737, 743-744 (7th Cir.1996). "The intent determination often will depend upon a bankruptcy court's assessment of the debtor's credibility, making deference to the court's finding particularly appropriate." *Id.*

Because direct evidence of fraudulent intent is rare, courts may rely on certain badges or indicia of fraud to determine whether a transfer was fraudulently conducted under Section 727. *See Zanderman, Inc. v. Sandoval (In re Sandoval)*, No. 96-2391, 1998 WL 497475, at *2 (4th Cir. Aug. 10, 1998). These "badges of fraud" include: (1) whether there is a lack or inadequacy of consideration for the transfer; (2) whether there is a family or insider relationship between the parties; (3) whether there is some retention of possession, benefit or use of the property in question by the debtor; (4) whether the financial condition of the debtor before and after the transfer is suspicious; (5) whether there is a pattern or series of transactions after the onset of the financial difficulties or pendency of threat of suit by creditors; (6) whether there is a suspicious chronology of events and transfers; (7) whether the debtor attempted to keep the transfer a secret; and (8) the proximity of the transfer to the debtor's bankruptcy filing. *See id.; West v. Abdelaziz (In re Abdelaziz)*, Adv. No. 11-6017, 2012 WL 359756, at *3 (Bankr. M.D.N.C. Feb. 2, 2012)(*citing Perkins v. Arnold (In re Arnold)*, 2009 WL 5217056, at *4 (Bankr. M.D.N.C. 2009)). "The presence of just one of the above listed factors can warrant a court's conclusion

that a transfer was fraudulently made, and, certainly, the presence of several factors 'can lead

inescapably to the conclusion that the debtor possessed the requisite intent.'" *In re Sandoval*,

1998 WL 497475, at *2 *(quoting In re Penner,* 107 B.R. 171, 175 (Bankr. N.D. Ind. 1989)).

"Indeed, certain 'badges of fraud' will strongly suggest a purpose to defraud unless some other

convincing evidence appears." *Cullinan Associates, Inc. v. Clements,* 205 B.R. 377, 380 (W.D.

Va. 1995)(*citing In re Woodfield,* 978 F.2d 516, 518 (9th Cir. 1992)).

In this case, the Court finds that Plaintiff proved, by a preponderance of the evidence,

that the Debtor transferred Moser's assets with the intent to hinder, delay and defraud Plaintiff.

In fact, the Court finds that of the eight enumerated badges of fraud set forth above, seven are

present in this case and when taken together, warrant the denial of the Debtor's discharge.

The timeline of events is key to the Court's analysis and highlights the various indicia of

fraud present in this case.  In July of 2009, Lafarge commenced the State Court Action against

Moser and the Debtor for their failure to pay amounts due and owing to Lafarge.  At some point

in October of 2009, the Debtor retained his bankruptcy counsel, Craig Palik, Esq.  Also in

October of 2009, the Debtor concluded that Moser could no longer continue in business and the

Debtor informed his children that he was going to close Moser and file for bankruptcy.[6]

Somewhere between the end of October, 2009 and the first of November, 2009, the Comptroller

of Maryland placed a lien on Moser's business bank accounts.  Approximately two weeks later,

the Comptroller of Maryland placed a lien on the Debtor's personal bank account. On November

4, 2009, the Debtor obtained an appraisal of Moser's vehicles in contemplation of their sale.  On

November 16, 2009, Moser's accounts payable ledger was produced to Lafarge in connection

---

[6] The Debtor's children, Dwayne Poffenberger and Billi Jo Horseman, were both employed by
Moser during this time.

with the State Court Action.  On November 18, 2009, the documents for the formation of Bolivar

were signed.  Bolivar is owned by the Debtor's two children, Dwayne Poffenberger and Billi Jo

Horseman.  On November 23, 2009, Bolivar filed its Articles of Organization.  On December 6,

2009, Moser ceased operations.  On December 8, 2009, Bolivar commenced operations out of

the same plant from which Moser had operated.  Also on December 8, 2009, Ms. Horseman

testified that Bolivar made its first delivery and hired the Debtor as a driver.  Moser's bank

statement for December, 2009, which was admitted into evidence as Plaintiff's Exhibit No. 45,

reflects that on December 8, 2009, after it ceased operations, Moser purchased materials from

Lafarge.  On December 10, 2009, a bill of sale was executed reflecting the sale of all of Moser's

trucks to Bolivar.  Without its vehicles, Moser no longer had the ability to produce or deliver

concrete.  The vehicles were purchased with funds borrowed from the Debtor and his spouse,

and then loaned to the Debtor's children.[7]  No other equipment, inventory or personal property of

Moser's, including customer lists, was purchased by Bolivar.  On December 23, 2009, the

Debtor filed his personal bankruptcy petition.  On February 25, 2010, Lafarge requested,

informally, documents regarding any transactions between Bolivar and either or both of Moser

or the Debtor.  On March 3, 2010, judgment was entered in favor of Lafarge and against Moser

in the amount of $357,172.29 in the State Court Action.  On March 18, 2010, an Order

compelling Moser to produce documents requested by Lafarge was entered in the State Court

Action setting a production deadline of March 30, 2010.  The documents were not produced by

March 30, 2010.  Instead, on March 30, 2010, Moser, through the Debtor, filed its bankruptcy

---

[7] The Debtor testified that Moser Farms, Inc., which is owned by the Debtor and his non-filing spouse as tenants by the entirety, obtained a loan from John and Nancy Hendricks (the "Hendricks Loan").  The Parties stipulated that Moser Farms, Inc. then loaned the money to Bolivar to purchase the vehicles from Moser.  Defendant's Exhibit No. 11, however, reflects that the Hendricks' Loan was made directly to the Debtor and his wife.

petition.  Prior to March 30, 2010, Moser did not advise Lafarge that it sold all of its vehicles to Bolivar.  From December 2009 through August 2010, Bolivar billed nearly $700,000.00 to Moser's former customers.

This timeline reveals several badges of fraud.  It highlights the undisputed fact that the transfer of Moser's assets to Bolivar was between family members.  It also shows that the Debtor retained some benefit from the transfer because he was employed by Bolivar.  The chronology of events and transfers are suspicious in that the aforementioned events all happened within a very short period of time and while Lafarge and other creditors were actively pursuing their claims against the Debtor and Moser.  The Debtor testified that he did not dispute that Moser owed money to Lafarge or that he had guaranteed Moser's obligation.  Rather, the Debtor testified that he merely questioned approximately $10,000.00 of the total balance due to Lafarge, which was ultimately determined to exceed $350,000.00.  Moreover, the transfer of Moser's assets and formation of Bolivar were done without Lafarge's knowledge, and the delay in producing documents that would have revealed the transfer is evidence of the Debtor's efforts to keep the transfer a secret until it was completed.  Lastly, the transfer of Moser's assets to Bolivar took place less than two weeks before the Debtor's bankruptcy filing.

An additional indicia of fraud present in this case is the lack of consideration paid by Bolivar for Moser's assets.  Although Bolivar paid what appears to be the fair market value for Moser's trucks, nothing was paid for any of the intangible assets Bolivar received from Moser.  For instance, during the first nine months of its operations, Bolivar billed approximately $690,000.00 to former customers of Moser.  Nevertheless, Bolivar paid nothing for Moser's customer lists.  Bolivar also received the benefit of Moser's reputation, it retained key employees of Moser, and it operated out of the same location as Moser.  These intangible assets, including

13

the transfer of Moser's customers and Moser's goodwill, have value and the fact that Bolivar paid nothing for them is evidence that Bolivar was created to carry on Moser's business free from the pressures of Lafarge and other creditors.

Further evidence that Bolivar was simply a continuation of Moser is the fact that Moser purchased materials from Lafarge on December 8, 2009, even though it had ceased operating on December 6, 2009. Coincidentally, Bolivar first poured concrete on December 8, 2009, and made its first delivery on December 8, 2009, two days prior to the execution of the bill of sale for the vehicles purchased from Moser by Bolivar. There was no evidence that Bolivar had purchased materials on or prior to December 8, 2009, and Ms. Horseman could not recall whether she or her brother had used their personal credit cards to purchase materials for Bolivar during the month of December, 2009. This circumstantial evidence leads to the conclusion that Bolivar used materials purchased by Moser to mix its first batch of concrete on December 8, 2009. There is no other explanation for Moser's purchase of materials after it ceased operating. Also important is the fact that Bolivar continued to make payments to North Star Foundations for a loan North Star Foundations made to Moser that was guaranteed by the Debtor, Dwayne Poffenberger and Billi Jo Horseman. Although Bolivar was not indebted to North Star Foundations, it continued to pay this obligation, which benefitted Moser and the Debtor until their respective bankruptcy cases were filed.

The timeline and indicia of fraudulent intent set forth above lead to the conclusion that the Debtor and his children moved swiftly to effectuate Moser's closing and Bolivar's opening to shield the transaction from Lafarge and to delay, hinder and defraud Lafarge. Once Lafarge established a *prima facie* case that the Debtor's discharge should be denied, the burden of proof shifted to the Debtor to provide satisfactory, explanatory evidence for his actions. *Farouki*, 14

14

F.3d at 249-250.  Here, the Debtor, Dwayne Poffenberger and Billi Jo Horseman all testified at trial and had the opportunity to provide convincing evidence that Bolivar's formation and the Moser-Bolivar Transaction were effectuated for legitimate reasons.  Unfortunately, all three witnesses were unable to remember important facts to such an extent that their testimony was either unreliable or not credible.  For example, none of the witnesses could recall the circumstances surrounding the Debtor's hiring by Bolivar.  Nor could the witnesses give a consistent time-frame to establish when the Debtor told his children that Moser would be closing operations or how Bolivar's clients were acquired.  Ms. Horseman, who handled Moser's accounts receivable, accounts payable and payroll from 1994 until it closed, and who assumed those same duties with Bolivar, could neither recall nor explain the following facts: (i) the date that Moser closed; (ii) whether there was a dispute between Moser and Lafarge concerning amounts due and owing to Lafarge, despite no payments having been made to Lafarge since June 2008 and Moser's bank accounts having been frozen by the Comptroller of Maryland; (iii) the discrepancy between Bolivar's first delivery date (December 8, 2009) and the date Bolivar purchased Moser's trucks (December 10, 2009).  Although the Court can understand that the closing of a family business in the face of mounting judgments would be stressful, there were simply too many inconsistencies and convenient lapses in memory in all three witnesses' testimony for the Court to find their accounts credible.  All three witnesses failed to provide satisfactory evidence to overcome the badges of fraud present in this case.  Accordingly, this Court finds that the transfer of Moser's assets to Bolivar was effectuated with the intent to hinder, delay and defraud Lafarge.

**B.      11 U.S.C. § 727(a)(4)(A)**

To be denied a discharge pursuant to Section 727(a)(4)(A) of the Bankruptcy Code, the

objecting party must prove by a preponderance of the evidence that:

> 1) the debtor made a statement under oath;
> 2) the statement was false;
> 3) the debtor knew the statement was false;
> 4) the debtor made the statement with fraudulent intent; and
> 5) the statement materially related to the bankruptcy case.

*Sheehan v. Stout (In re Stout),* 348 B.R. 61, 64 (Bankr. N.D.W.Va. 2006) (*citing Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 251-52 (4th Cir. 1987)).  "Once it reasonably appears that the oath is false, [however,] the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged."  *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 482 (E.D. Va. 1997).  Section 727(a)(4)(A) necessitates a showing that the false oath was made "knowingly and fraudulently." 11 U.S.C. § 727(a)(4)(A); *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 483 (E.D. Va. 1997).  Because a debtor is unlikely to admit that he acted with fraudulent intent, fraudulent intent may be established in one of two ways.  *Id.* at 483-484.  First, it may be established by circumstantial evidence or by inference drawn from a course of conduct.  *Id.* (*citing Williamson,* 828 F.2d at 252).  "Thus a 'pattern of concealment and nondisclosure' would permit an inference of the requisite intent."  *Id. (citing In re Ingle,* 70 B.R. 979, 983 (Bankr. E.D.N.C. 1987)).  Second, "courts have determined that a 'reckless indifference to the truth' constitutes the 'functional equivalent of fraud.'" *Id. (citing In re Johnson,* 139 B.R. 163, 166 (Bankr. E.D. Va. 1992)).  Where a debtor subsequently discloses omitted assets, such later disclosure does not expunge a prior false oath.  *Rosenbaum v. Kilson (Matter of Kilson)*, 83 B.R. 198, 203 (Bankr. D. Conn. 1988).  Nevertheless, courts have held that a debtor's disclosure of previously omitted information is "some evidence of innocent intent."  *Id; see also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997).  "A debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."  *Id.* at 1294 -1295.

In this case, Lafarge argues in its post-trial memorandum that the Debtor should be denied a discharge under Sections 727(a)(4) and (a)(7) based on (i) the values the Debtor assigned to his interests in Moser, LLC and Moser Farms, Inc. in the Debtor's initial Schedule B, and (ii) the lack of documentation evidencing a loan from Dwayne Poffenberger to Moser and the conflicting testimony of Dwayne Poffenberger regarding said loan. It was also stipulated to at trial that the Debtor did not list the Hendricks Loan on his bankruptcy schedules.

Addressing the arguments made in Lafarge's post-trial memorandum first, the Court finds that the aforementioned inconsistencies and omissions are insufficient to deny the Debtor a discharge under Sections 727(a)(4) or (a)(7). The Debtor filed an amended Schedule B reflecting higher valuations for his interests in Moser, LLC and Moser Farms, Inc. on April 9, 2010, which was less than three months after he filed his initial Schedule B and nearly two months prior to the filing of the Chapter 7 Trustee's Report of No Distribution. The Amended Schedule B was filed with ample time for the Trustee to investigate whether the assets had any liquidation value for joint creditors.[8] As for the inconsistencies between Dwayne Poffenberger's deposition testimony and his trial testimony regarding the structure of a loan he made to Moser, and the lack of evidence supporting any such loan, these inconsistencies do not prove that the Debtor had any fraudulent intent with respect to his bankruptcy schedules or Moser's bankruptcy schedules. Loans by family members to support a family business are not always reflected by documentation and there was no evidence to contradict the testimony that family members loaned money to Moser. Thus, the Court finds that the lack of documentary evidence alone is

---

[8] As stated previously, the Debtor owns Moser, LLC and Moser Farms, Inc. with his spouse as tenants by the entireties. Therefore, his interest in both entities was exempt except as to joint creditors and federal tax obligations. *See United States v. Craft*, 535 U.S. 274 (2002); *Sumy v. Schlossberg (In re Sumy)*, 777 F.2d 921 (4th Cir. 1985).

insufficient to deny the Debtor a discharge under Section 727(a)(4) under these circumstances.

Of greater significance to the Court is the omission of the Hendricks Loan from the Debtor's schedules. As stated previously, the Parties stipulated that Moser Farms, Inc. provided the financing to Bolivar that enabled Bolivar to acquire the vehicles from Moser. Although the Debtor testified that Moser Farms, Inc. borrowed the money from the Hendricks and the proceeds of the Hendricks Loan were never in his or his wife's possession, he also testified that he believed the loan documents evidencing the Hendricks Loan incorrectly reflect that the Hendricks Loan was made to the Debtor and his spouse, not to Moser Farms, Inc. The Debtor testified on cross-examination that he later learned that there was a tax savings realized from the manner in which the Hendricks Loan was documented and that the Hendricks Loan was structured for that purpose. The Debtor's testimony and the documentary evidence clearly establish that the Hendricks Loan was made to the Debtor and his wife. Although the Debtor and his wife subsequently loaned the money to Moser Farms, LLC,[9] the loan from the Hendricks to the Debtor and his spouse should have been included as a liability on the Debtor's bankruptcy schedules, and the obligation of Moser Farms, LLC to the Debtor should have been included as an asset on the Debtor's bankruptcy schedules. In light of these omissions, the question becomes whether the Debtor knowingly and fraudulently omitted these transactions from his bankruptcy schedules. Although the Court did not find the Debtor to be a credible witness generally, the Court does not believe he intentionally omitted the Hendricks Loan and the related loan to Moser Farms, Inc. from his bankruptcy schedules. The Court finds that the omission was either an

---

[9] Plaintiff's Exhibit 15 is letter from Moser Farms, Inc. to Bolivar stating that Moser Farms, Inc. has agreed to loan Bolivar $158,143.50 for the purpose of purchasing equipment. The Parties also stipulated that Moser Farms, Inc. provided the financing to Bolivar to enable Bolivar to purchase the vehicles from Moser. The Court notes, however, that no loan documents evidencing the loan from the Debtor and his spouse to Moser Farms, Inc. were admitted into evidence at trial.

oversight by the Debtor, or, as the Debtor testified, a consequence of the Debtor's belief that the Hendricks Loan was meant to be between the Hendricks and Moser Farms, Inc.  A comparison of the docket in the Debtor's bankruptcy case, of which this Court can take judicial notice, and the Debtor's amended bankruptcy schedules, reflects that the Debtor reaffirmed all of his debts for which his spouse is a joint obligor.  The Debtor could have simply scheduled the Hendricks Loan and then reaffirmed it.  In fact, by not scheduling and reaffirming the Hendricks Loan, the Debtor has exposed his assets owned as tenants by the entirety to possible liquidation by the Chapter 7 Trustee to satisfy this obligation.[10]  For this reason, the Court does not find that the Debtor intentionally omitted the Hendricks Loan from his bankruptcy schedules.

In sum, Lafarge failed to establish that the Debtor knowingly and fraudulently made a false oath in connection with his bankruptcy schedules.  Specifically, Lafarge failed to establish "a pattern of concealment and nondisclosure" and failed to establish that the Debtor possessed a "reckless indifference to the truth" with respect to his bankruptcy schedules or Moser's bankruptcy schedules.  *See In re Hatton,* 204 B.R. at 482.  Accordingly, Lafarge's request to deny the Debtor a discharge under Section 727(a)(4) is denied.

**C.**    **11 U.S.C. § 523(a)(6)**

Lastly, the Amended Complaint seeks a determination that the debt owed by the Debtor to Lafarge is nondischargeble under 11 U.S.C. § 523(a)(6).  Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  "The word 'willful' in (a)(6) modifies the

---

[10] The Court notes that Fed. R. Bankr. P. 4008(a) provides that reaffirmation agreements *"shall* be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a) of the Code."  Fed. R. Bankr. P. 4008(a).  Fed. R. Bankr. P. 4008 further provides that the Court "may, at any time and in its discretion, enlarge the time to file a reaffirmation agreement."  *Id.*

word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not

merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57,

61 (1998). "Had Congress meant to exempt debts resulting from unintentionally inflicted

injuries, it might have described instead 'willful acts that cause injury.'" *Id.* "Or, Congress

might have selected an additional word or words, *i.e.,* 'reckless' or 'negligent,' to modify

'injury.'" *Id.* Implied malice satisfies the malice standard of Section 523(a)(6) and can be shown

by the conduct of the debtor in the context of his or her surrounding circumstances. *Miller v.

Cigna Ins. Co.*, 311 B.R. 57, 62 (D. Md. 2004) (citing *Hagan v. McNallen (In re McNallen)*, 62

F. 3d 619, 625 (4th Cir. 1995). "Since the *Geiger* decision, courts have struggled to determine

whether a debtor must have specifically intended the injury or whether the commission of an

intentional tort that is 'substantially certain to result in injury' is sufficient to satisfy the

willfulness requirement." *Haas v. Trammell (In re Trammell),* 388 B.R. 182, 186-187 (Bankr.

E.D.Va. 2008). "The Court of Appeals for the Fourth Circuit appears to have adopted the

'objective substantial certainty' or 'subjective motive' test to satisfy the willfulness

requirement." *Id. (citing Parsons v. Parks (In re Parks),* No. 03–1072, 2003 WL 22989684, at *1

(4th Cir. Dec. 19, 2003) ("[t]he test, then, is whether the debtor acted with 'substantial certainty

[that] harm [would result] or a subjective motive to cause harm.'")). A debtor's misconduct

under Section 523(a) need only be shown by a preponderance of the evidence. *First Nat'l. Bank

v. Stanley (In re Stanley)*, 66 F. 3d 664, 667 n.4 (4th Cir. 1995) (citing *Grogan v. Garner*, 498

U.S. 279 (1991)).

  In this case, Plaintiff does not allege that the underlying obligation owed by Moser and

the Debtor to Lafarge was incurred as a result of Debtor's willful and malicious injury. Rather,

Plaintiff alleges that the Debtor's conduct in the State Court Action leading up to and after entry

of the Judgment warrants a finding that the debt owed to Plaintiff is nondischargeable under Section 523(a)(6). Specifically, Lafarge alleges that Debtor's actions in transferring Moser's assets and unreasonably delaying the State Court Litigation were deliberate and intentional, and were part of a calculated scheme "to vex, delay and impede Lafarge in the pursuit and enforcement of its claims . . . ." Lafarge alleges that the Debtor acted with malice when he willfully and intentionally caused Moser to hinder and delay enforcement of Lafarge's claims by selling and/or transferring Moser's business and assets to the detriment of Lafarge. Lafarge further alleges that the Debtor acted with malice when he caused Moser to file a petition in bankruptcy and has continued to act with malice and intent to injure Lafarge "by willfully and intentionally frustrating and delaying, and causing Moser and Bolivar to frustrate and delay, Lafarge's lawful rights, and by harassing Lafarge with a false and frivolous motion for contempt." In its post-trial memorandum, Plaintiff argues that the "debtor further hindered and delayed Lafarge's efforts (and further needlessly and baselessly increased Lafarge's legal fees), when he filed a cross-motion for contempt in this proceeding which was not based on any applicable legal authority and sought relief contrary to binding principles of law." Count I asserts that the Debtor's actions constitute willful and malicious injury by the Debtor to Lafarge and that there is no just cause or excuse for the Debtor's conduct. Lafarge alleges that such damages include not only Moser's debt to Lafarge (the total Judgment amount of $357,172.29 plus accrued interest thereon), but also some measure of Lafarge's attorney's fees and costs incurred as a result of the Debtor's efforts to hinder and delay Lafarge's enforcement of its claims.

        As stated above, the burden of proof in a dischargeability action is the preponderance of the evidence standard. *See In re Stanley*, 66 F. 3d at 667. Here, Lafarge failed to meet this

21

burden with respect to Count I.  As stated above, Count I does not assert that the underlying

obligation owed by the Debtor to Lafarge was incurred as a result of a willful and malicious

injury.  Rather, Count I argues that the Debtor's lack of cooperation and legal maneuvering in

the State Court Action and in the two bankruptcy cases caused Lafarge to incur additional legal

fees and that such conduct constitutes a willful and malicious injury under Section 523(a)(6).

Although the Court commends Plaintiff's creativity, Plaintiff cites no case law to support its

novel legal theory that the Judgment and any legal fees incurred as a result of Debtor's lack of

cooperation constitutes a nondischargeable debt under Section 523(a)(6).  Plaintiff simply did

not establish that the Debtor acted with malicious intent to harm Lafarge.  Any legal fees

incurred by Lafarge as a result of the Debtor's dilatory actions was a consequence of the

Debtor's actions, but not the intended purpose of his actions.  Accordingly, the Court finds that

the Plaintiff failed to prove that the Debtor's actions constitutes a willful and malicious injury

under Section 523(a)(6).

## IV.     <u>Conclusion</u>

For the reasons set forth herein, the Court finds that the Debtor shall be denied his

discharge pursuant to 11 U.S.C. § 727(a)(7).  A separate Order will issue.


cc:     All Parties
        All Counsel
        Chapter 7 Trustee
        United States Trustee


**END OF MEMORANDUM**